**IN THE UNITED STATED DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| MARCOS A. HODGSON-GÓMEZ; HENRY J. HODGSON-MICO; IRIS ROSA; BEVERLY HODGSON-ROSA; MARK A. HODGSON-MICO; YOLANDA GONZALEZ; AMANDA HODGSON-GONZÁLEZ; MICHAEL A. HODGSON-MICO; MICHELLE ACOSTA for themselves and in representation of their minor children M.H.A and S.H.A; DAMARIS E. MARTÍNEZ-PÉREZ; OSMANI CRUZ MARTÍNEZ; HÉCTOR D. MARTÍNEZ-PÉREZ; and JOSEFINA ECHAVARRIA; | Civil No.: 14-1705 |
| Plaintiff(s), | |
| v. | RE: TORT ACTION FOR MEDICAL MALPRACTICE PURSUANT TO ARTS. 1802 AND 1803, 31 P. R. Laws Ann. §§ 5141 AND 5142. |
| METRO-HEALTH INC. d/b/a/ HOSPITAL METROPOLITANO DE GUAYNABO; CONTINENTAL INSURANCE COMPANY; DR. JORGE RIVERA VARGAS; DR. LARRY VAN DAALEN; MELVIN MELÉNDEZ-RIOS, DR. FRANCES VÉLEZ-LAGO, ABC INSURANCE CO.; EFG INSURANCE CO.; JOHN DOE; JAMES ROE; MOE-FOE CONJUGAL PARTNERSHIPS I-X; SINDICATO DE ASEGURADORES PARA LA SUSCRIPCIÓN CONJUNTA DEL SEGURO DE RESPONSABILIDAD PROFESIONAL MÉDICO-HOSPITALARIA ("SIMED"); | **JURY TRIAL DEMANDED** |
| Defendant(s). | |

**COMPLAINT**

<u>**TO THE HONORABLE COURT:**</u>

**APPEAR NOW** the Plaintiffs, MARCOS A. HODGSON GOMEZ, HENRY J. HODGSON MICO, IRIS ROSA, BEVERLY HODGSON-ROSA, YOLANDA GONZALEZ, AMANDA HODGSON-GONZÁLEZ, ANTONIO HODGSON-GONZÁLEZ, MICHAEL A. HODGSON-MICO, MICHELLE ACOSTA for themselves and in representation of their minor children M.H.A. and S.H.A., DAMARIS E. MARTINEZ, OSMANI CRUZ-MARTÍNEZ, HECTOR D. MARTINEZ, JOSEFINA ECHAVARRÍA, (hereinafter referred to as "Plaintiffs"), through the undersigned counsel, and hereby states, alleges, and requests as follows:

**JURISDICTIONAL BASIS**

1.   Plaintiffs are domiciled and/or residents of Florida, Texas, Virginia, Wisconsin, Guatemala or Dominican Republic.

2.   All Defendants are either individuals who reside in Puerto Rico or corporations organized under the laws of the Commonwealth of Puerto Rico or of states or countries other than Florida, Texas, Virginia, Wisconsin, Dominican Republic or Guatemala.

3.   The matter in controversy exceeds the sum of SEVENTY FIVE THOUSAND DOLLARS ($75,000.00), exclusive of interest and costs, thus vesting jurisdiction on this Honorable Court pursuant to 28 U.S.C. § 1332.

**THE PARTIES**

4.   **MARCOS A. HODGSON-GÓMEZ** is patient Sylvia Martínez-Hodgson's grandfather, who is domiciled in Florida.

5.   **HENRY J. HODGSON-MICO** is Sylvia Martínez-Hodgson's uncle, who is domiciled in Florida.

6.   **IRIS ROSA** is Sylvia Martínez-Hodgson's aunt who is married to and is domiciled with Henry J. Hodgson in Florida.

7.   **BEVERLY HODGSON-ROSA** is Sylvia Martínez -Hodgson's cousin and the child of Henry Hodgson and Iris Rosa, and is domiciled in Florida.

8.   **MARK A. HODGSON-MICO** is Sylvia Martínez -Hodgson's uncle, who is domiciled in Guatemala.

9.   **YOLANDA GONZÁLEZ** is Sylvia Martínez -Hodgson's aunt who is married to and is domiciled with Mark A. Hodgson-Mico in Guatemala.

10.  **AMANDA HODGSON-GONZÁLEZ** is Sylvia Martínez -Hodgson's cousin and the daughter of Mark Hodgson and Yolanda González, and is domiciled in Virginia.

11.  **MICHAEL A. HODGSON-MICO** and **MICHELLE ACOSTA** are the uncle and aunt of Sylvia Martínez-Hodgson and both are domiciled in Texas, they appear for themselves and in representation of their minor children M.H.A. and S.H.A., who, like their parents, are also domiciled in Texas.

12.  **DAMARIS E. MARTÍNEZ-PÉREZ** is Sylvia Martínez-Hodgson's aunt who is domiciled in Florida.

13.  **OSMANI CRUZ-MARTÍNEZ** is a cousin of Sylvia Martínez-Hodgson who is domiciled in Wisconsin

14.  **HECTOR D. MARTÍNEZ** and **JOSEFINA ECHAVARRÍA** are the uncle and aunt of Sylvia Martínez-Hodgson and both are domiciled in the Dominican Republic.

15.  Co-Defendant Metro-Health, Inc. owns, operates and/or manages Hospital Metropolitano de Guaynabo, **d/b/a HOSPITAL METROPOLITANO DE GUAYNABO** (hereinafter "**HOSPITAL METROPOLITANO**" or "hospital").

16.   Co-Defendant Metro-Health, Inc. is a for-profit corporation duly incorporated and registered in and with its principal place of business in Puerto Rico.

17.   Co-Defendant Metro-Health, Inc. also owns, operates or manages other hospitals in Santurce, Hato Rey, Rio Piedras, Arecibo, Ponce and Mayagüez, as well as in other towns throughout Puerto Rico.

18.   Co-Defendants Metro-Health, Inc. promotes and holds itself to the public that it has a network of twelve (12) hospitals it call MetroPavia Health Systems (MPHS) which offers a wide gamut of medical care throughout Puerto Rico.

19.   Co- Defendant Metro-Health, Inc. owns and/or operates THE METROPOLITAN HOSPITAL located in GUAYNABO,  Puerto Rico, wherein it provides its patients with a gamut of hospital services and/or  hospital care, including emergency services, internal medicine and neurology, among other specialties.

20.   Co-Defendant **CONTINENTAL INSURANCE COMPANY** is a CNA corporation, which insures Co-Defendant Metro-Health Inc, d/b/a HOSPITAL METROPOLITANO in Guaynabo's medical, nursing, hospital staff and other personnel for medical malpractice.

21.   Co-Defendant **DR. JORGE D. RIVERA-VARGAS  (hereinafter DR. RIVERA)** is an internal medicine physician authorized to practice medicine in Puerto Rico, who treated Sylvia Martinez Hodgson during the time period relevant to this complaint.

22.   Co-Defendant **DR. LARRY VAN DAALEN-BADILLO   (hereinafter DR. VAN DAALEN)** is a also an internal medicine physician authorized to practice medicine in Puerto Rico, who also treated Sylvia Martinez Hodgson at Hospital Metropolitano, during the time period relevant to this complaint.

23.   Co-Defendant **DR. FRANCES MARIE VÉLEZ-LAGO  (hereinafter DR. VÉLEZ)** is a

neurologist physician authorized to practice medicine in Puerto Rico, with privileges at Hospital Metropolitano, where she evaluated and treated Sylvia Martinez during the time period relevant to this complaint.

24. Co-Defendant **DR. LARRY E. BERNIER-GONZÁLEZ** (hereinafter Dr. **BERNIER**) is an emergency medicine physician authorized to practice medicine in Puerto Rico, with privileges at Hospital Metropolitano, where he evaluated and treated Sylvia Martinez Hodgson during the time period relevant to this complaint.

25. Co-Defendant **DR. MELVIN MELÉNDEZ-RIOS** (hereinafter Dr. **MELÉNDEZ**) is a gastroenterologist authorized to practice medicine in Puerto Rico, with privileges at Hospital Metropolitano, where he was contacted for consultation, evaluated and treated Sylvia Martinez Hodgson during the time period relevant to this complaint..

26. Co-Defendant **ABC INSURANCE CO., INC.** is a corporation organized or operating under the laws of the Commonwealth of Puerto Rico, with its principal place of business in Puerto Rico or in a state or country other than Florida, Texas, Virginia, Wisconsin, Guatemala or Dominican Republic, which has issued an insurance policy (ies) on behalf of one or more codefendants for the acts or omissions described herein, encompassing the relevant period of time.

27. Co-Defendants unknown joint tortfeasors **JOHN DOE** and **JAMES ROE** are physicians or other health care providers fictitiously named herein, to be later replaced by their actual names which may become known through further discovery in this litigation, and who may be liable to Plaintiffs, in whole or in part, for the actions and/or omissions herein described, encompassing the relevant period of time, and the damages suffered by Plaintiffs.

28. Co-Defendants **MOE-FOE CONJUGAL PARTNERSHIPS I-X** are unknown conjugal partnerships comprised of the individual defendants and their respective husbands and/or wives, who are currently unknown.

29. Co-Defendant **Sindicato de Aseguradores para la Suscripción Conjunta de Seguro de Responsabilidad Profesional Médico-Hospitalaria** (hereinafter, "**SIMED**") is an insurance company organized, existing, and with its principal place of business in Puerto Rico or a state, territory or country other than Florida, Texas, Virginia, Wisconsin, Guatemala and Dominican Republic, which issued insurance policies for medical malpractice on behalf of one or more of the physician Co-Defendants Joint Tortfeasors in this case, for the acts and/or omissions described herein, encompassing the relevant period of time.

30. Co-Defendant **EFG INSURANCE COMPANY** is a corporation organized or operating under the laws of the Commonwealth of Puerto Rico, with its principal place of business in Puerto Rico or in a state or country other than Florida, Texas, Wisconsin, Virginia, Guatemala and Dominican Republic which additionally insures all or some of the Co-Defendants Joint Tortfeasors in this case for the acts and/or omissions described herein, encompassing the relevant period of time.

31. Pursuant to 26 P.R. Laws Ann. § 2001, a direct action may be brought in the Commonwealth of Puerto Rico against a casualty or liability insurance carrier for the negligence or fault of its insured.

32. Pursuant to 26 P.R. Laws Ann. § 2003, an action against an insurer may be brought separately or may be joined with an action against its insured.

## GENERAL ALLEGATIONS

33.  Sylvia Patricia Martínez-Hodgson (hereinafter referred to as "Sylvia" or "patient") was born in Santurce, at Pavia Hospital, on March 6, 1990 and was diagnosed with Hydrocephalus.

34.  Doctors proceeded to correct Sylvia's condition and placed a ventriculo-peritoneal shunt ("VP Shunt") to dispose of the excess cerebrospinal fluid ("CSF") through a valve and catheter into the abdominal cavity.

35.  In October 1992, after being admitted to a hospital due to a valve malfunction, she suffered a cardio-pulmonary arrest as a result of her neurosurgeon not performing a "valve tap" in a timely fashion.  Fortunately, the valve tap was performed and Sylvia immediately and totally recovered.

36.  The VP Shunt had to be adjusted, unclogged or replaced several times during Sylvia's lifetime.

37.  Sylvia's childhood and adolescence was spent normally, with the exception of isolated episodes with her VP shunt.

38.  Sylvia was a very social girl; outstanding at both work and school.  Everyone who met Sylvia would fall in love with her immediately.  Her people skills, cheerfulness, and talent for singing won her the affections of all.  She would regularly identify with the needs of others, forgetting about her current condition to help and advise all those around her.

39.  Having studied at Wesleyan Academy until sixth grade, she mastered both English and Spanish as native languages.  She also had an exceptional and unique memory.  She successfully graduated from high school and studied Business Administration.  She worked as an office clerk up to the weekend preceding her passing.

40. As a granddaughter, nice and cousin she was exemplary – obedient, respectful, and always had a desire to please and honor her family.

41. When she was 14, she underwent a spinal fusion in HIMA Hospital in Caguas, which kept her convalescing for about 10 months.  This procedure was unsuccessful, so it became necessary to remove the items placed in her spine.  A year and a half later, the same procedure was successfully performed in the Saint Louis Children's Hospital at Washington University.  After this surgery, she was not able to walk again and began to permanently use a wheelchair to get around.

42. In March 2013, she was treated for a clot in her thigh known as thrombophlebitis at Hospital Auxilio Mutuo where a Doppler study was carried out.

43. As part of Sylvia's ongoing treatment, Dr. Rivera prescribed Coumadin for a period of six months.  In August 2013, Dr. Rivera decided to prescribe a new drug called Xarelto, providing samples for use, since this did not require weekly blood tests to check for clotting.

44. Beginning in September, the new treatment was started for a week but stopped shortly thereafter because Sylvia presented adverse effects, as indicated in the drug information, after only a week.  Dr. Rivera Vargas decided to continue prescribing Coumadin to Sylvia.

45. On Friday, September 20, Sylvia Patricia had discomfort in her digestive system and she took Pedialyte, which made her feel better by the evening of Saturday the 21st.

46. On Sunday, September 22, 2013, Sylvia's mother Joan Hodgson de Martínez noticed that she was breathing harder than usual and her lips were gray.

47. Joan spoke to Dr. Rivera and told him she was taking Sylvia to emergency room at Hospital Metropolitano.

48. Dr. Rivera Vargas agreed to meet Sylvia at the Hospital Metropolitano .

49. Sylvia's parents took her to the emergency room of the Hospital Metropolitano in Guaynabo, arriving at approximately 2:30 pm Sunday, September 22, 2013.

50. While at Hospital Metropolitano, Sylvia was treated by emergency room physician LARRY E. BERNIER-GONZALEZ (hereinafter "Dr. Bernier").

51. Upon arrival at the ED of Hospital Metropolitano, Dr. Bernier was informed that Sylvia was on the blood thinner Coumadin and had a VP shunt that may be not functioning properly.

52. Dr. Bernier ordered some laboratory and radiology tests.

53. The laboratory results indicated that Sylvia's blood was extremely anti-coagulated, at an INR value of 14.

54. Dr. Bernier placed a consultation with internist Dr. Larry Van Daalen Badillo at approximately 9 pm.

55. Sometime after 9 pm, Dr. Van Daalen interviewed Sylvia, her parents and proceeded to examine and evaluate Sylvia.

56. Sylvia's parents suspected that the abdominal fluid showing in Sylvia's CT was cerebrospinal fluid and informed the attending doctor, Dr. Van Daalen, that the shunt's valve could be malfunctioning.

57. Dr. Van Daalen ordered a head CT STAT and discussed its abnormal results with Sylvia's parents.

58. Upon information and belief, Dr. Van Daalen also consulted Head CT results with radiologist Dr. Fernando López.

59. Dr. Van Daalen indicated Sylvia needed MRI studies to determine shunt malfunction.

60.   Dr. Van Daalen informed Sylvia's parents that the MRI machine at the hospital was not working.

61.   Sylvia's parents informed Dr. Van Daalen that Sylvia was highly dependent on the valve and, if the valve was clogged, she would begin to show symptoms.

62.   Sylvia's parents insisted that it was necessary for a neurosurgeon to see Sylvia, and if there was none available in the hospital, it was necessary for her to be transferred to another hospital.

63.   Dr. Van Daalen indicated that Metropolitan Hospital had no neurosurgeon, but one could be sent for from another Pavia Hospital in their system.

64.   Sylvia's parents specifically told Dr. Van Daalen that at age two, Sylvia's shunt valve had previously malfunctioned, which led to a cardiopulmonary arrest and that this was immediately reversed when the neurosurgeon relieved the pressure in the brain by extracting fluid with a syringe inserted through the VP shunt.

65.   Dr. Van Daalen informed Sylvia and her parents that the assistance of a neurosurgeon from an outside institution would be requested because the Metropolitan Hospital did not have any at the moment.

66.   At 11 pm, Dr. Van Daalen admitted Sylvia to the Hospital, under his care.

67.   Dr. Van Daalen placed a consultation request to gastroenterologist Dr. Meléndez-Ríos in his admission orders.

68.   According to the medical record, at approximately 11 pm, Dr. Van Daalen decided not to transfer Sylvia at this time, despite her parents' requests.

69. Dr. Van Daalen proceeded to fill out the admittance request and admitted Sylvia with a diagnosis of upper gastrointestinal bleed (UGIB), Coumadin intoxication, anemia, thrombophlebitis and hydrocephalus, and VP shunt malfunction.

70. The next day, September 23, 2013, at 9:32 am, radiologist Dr. Fernando Lopez' report was transcribed and stated among other things, "… possible cerebellar tonsil herniation. Further evaluation with brain MRI is recommended if not already done."

71. At 9:45 am, Dr. Van Daalen entered a note in the medical record transferring service for the medical care of Sylvia to Dr. Rivera-Vargas.

72. When Dr. Rivera-Vargas visited Sylvia, both parents urgently requested that Sylvia be seen by a neurosurgeon.

73. Sylvia's parents told Dr. Rivera-Vargas, as they had told Dr. Van Daalen, they suspected the VP shunt was not working properly and pressure was building up in Sylvia's brain.

74. Dr. Rivera Vargas told Sylvia's parents that he would decide whether to consult with a neurologist.

75. Dr. Rivera-Vargas advised Sylvia's parents to allow for the opening of a central vein ("IV Port"), requiring Sylvia's transfer to the operating room.

76. That morning Sylvia was taken to the operating room, she waited five (5) hours before the surgeon carried out the 15 minute operation to put in the central line subclavia.

77. Sylvia's parents also approached the surgeon to ask if he could do the simple valve tap to relieve intracranial pressure.  The surgeon said he could, but would prefer it to be done by a neurosurgeon.

78. A nurse came out and informed Sylvia's parents that Sylvia was not feeling well; Sylvia's parents asked the nurse to have Sylvia's blood sugar levels checked, as she had not eaten in the past twenty-four (24) hours.

79. At Sylvia's parents' insistence, Sylvia was finally administered glucose solution and improved.

80. At approximately 5 pm, Dr. Rivera Vargas arrived and Sylvia's parents asked if a neurosurgeon had been brought or if it would be necessary to transfer Sylvia so that the neural tap could be carried out.

81. Dr. Rivera-Vargas reassured them that he was making arrangements for Sylvia's transfer.

82. Sylvia continued to deteriorate on Monday night and, in the absence of nursing care and monitoring, her parents stayed overnight at the foot of her bed.

83. Sylvia could hardly speak at this point and, while the symptoms of a clogged valve remained, her parents awaited the transfer to another Pavia Hospital in Santurce, as had been promised.

84. Sylvia's mother occasionally tried to offer her relief by readjusting her, but the inflammation from the accumulation of fluid around the valve area made this nearly impossible.

85. On Tuesday at approximately 9:34 am, Dr. Rivera-Vargas placed an order in the medical record for a neurological consultation with Dr. Vélez.

86. At 10:30 am, Dr. Rivera-Vargas spoke directly with Dr. Vélez and requested an evaluation due to neurological change.

87. At Sylvia's mother's insistence Dr. Rivera-Vargas, contacted Dr. Eric Carro, who had been Sylvia's neurosurgeon for the past 20 years.

88. Dr. Carro told Dr. Rivera Vargas to release Sylvia for a transfer to a hospital where Dr. Carro could perform the required shunt tap.

89. On Tuesday morning, Dr. Rivera Vargas informed the parents that he had spoken to the Administrator of MetroPavia Health System, Mr. Alfredo Volkers, to transfer Sylvia to Pavia Hospital in Santurce, for examination of the valve and intervention of a neurosurgeon.

90. That same morning, Sylvia's father, Juan Martinez, also left a message for Mr. Volkers with his secretary and two hours later (shortly after 12 noon) personally discussed Sylvia's needed immediate transfer with Metro Pavia Health System Administrator Mr. Volkers. Mr. Volkers also spoke with the hospital director and other management personnel regarding Sylvia's transfer.

91. Mr. Volkers informed Sylvia's father that the hospital director would contact a neurosurgeon at Pavia Hospital in Santurce to allow Sylvia to be transferred within its own system of hospitals.

92. Dr. Rivera Vargas told the parents that Sylvia would be taken first to San Francisco Hospital for an MRI scan, since the MRI machine at Hospital Metropolitano was not working, and afterwards, she would be transferred to Pavia Hospital in Santurce for the tap. The parents argued that the MRI scan should be performed at Pavia Hospital Santurce as well.

93. At approximately 2:30 pm, the head nurse arrived along with Carmen, the person in charge of hospital transfer, and were told by Sylvia's parents that Sylvia urgently needed the transfer.

94. Sylvia's parents pleaded with Carmen and the male nurse in charge of coordinating Sylvia's transfer, as well as with Dr. Rivera-Vargas, to allow them to transport Sylvia at their sole responsibility to another facility for the urgently needed neurosurgical care, but were declined.

95. The male nurse, as well as other hospital nurses, were unaware of Sylvia's condition, and were under the wrong impression that Sylvia normal state was permanently in her current bedridden and unresponsive state.

96. After 4:00 pm, Dr. Meléndez finally showed-up to evaluate Sylvia and notified her parents that, although he had been contacted on Sunday, he wanted to give Sylvia some time to rest before evaluating her.

97. Dr. Meléndez indicated that Sylvia was not hepatopathic and was not concerned about her liver function.

98. Dr. Meléndez ordered some blood tests.

99. It was not until 5:30 pm when neurologist Dr. Vélez finally arrived to evaluate Sylvia.

100. Sylvia's parents asked Dr. Vélez to transfer Sylvia to the Pavia Hospital in Santurce, so that a tap could be performed by a neurosurgeon.  The neurologist refused, insisting Sylvia must be taken to San Francisco Hospital for an MRI scan instead.

101. Dr. Vélez indicated that, although Sylvia needed to be transferred, she would have to wait for Dr. Rivera-Vargas' ultimate decision.

102. That same night Sylvia went into respiratory arrest and died.

103. According to the death note filled out by Co-defendant Jorge Rivera-Vargas, Sylvia died at 9:48 pm, due to among other things, her Ventriculo-Peritoneal Shunt malfunction.

104. According to the death certificate, also filled out by Co-defendant Jorge Rivera Vargas,

Sylvia died due to Ventriela-Peritoneal shunt malfunction, among other causes.

105. Sylvia Patricia Martinez Hodgson was only twenty-three (23) years young when she died.

**FIRST CAUSE OF ACTION**
**FOR NEGLIGENCE UNDER ARTICLE 1802 & 1803**
**OF THE PUERTO RICO CIVIL CODE AGAINST**
**METROPOLITAN HOSPITAL AND ITS PERSONNEL**

106. The allegations contained above are incorporated by reference as if again fully set forth herein.

107. Hospital Metropolitano has emergency, radiology, internal medicine, gastroenterology, neurology and intensive care departments within its hospital premises.

108. At the relevant times of this complaint, Hospital Metropolitano operated or contracted to operate emergency care and provided medical care in the areas of telemetry, surgery, internal medicine, gastroenterology, neurology, radiology and intensive care departments within its premises.

109. The hospital sets up policies, procedures and/or requirements for the operation of the emergency department, as well as internal medicine, nurisng, neurology, gastroenterology and intensive care departments on its premises.

110. The hospital supplies nursing, clerical, administrative, and technical personnel to the various departments of the hospital.

111. The hospital derives revenue from the services provided at and by the emergency and other departments within its premises.

112. The hospital is liable for medical malpractice occurring at the emergency and other departments located on its premises.

113. The treatment offered by Hospital Metropolitano to Sylvia P. Martinez, through its medical, nursing, technical personnel and/or the doctors with privileges who used its

facilities, was below the standard that satisfies the exigencies generally recognized by the medical profession in light of the modern means of communication and teaching and, as such, directly caused and/or contributed to causing Plaintiffs the untimely death of their beloved granddaughter/niece/cousin, Sylvia P. Martinez, and the injuries as described herein.

114. Hospital Metropolitano's personnel failed to exercise the care and precautions required under the circumstances in order to prevent the loss of Sylvia P. Martinez Hodgson's life, lacked the required knowledge and medical skill, failed to timely have available the personnel and equipment necessary to avoid the injuries and subsequent death of Sylvia P. Martinez Hodgson.

115. Hospital Metropolitano negligently failed to recognize or otherwise ignored the serious nature of Sylvia P. Martinez Hodgson's condition and allowed her admittance despite the fact that it knew it did not have the specialist and radiological equipment to adequately treat her life threatening condition.

116. Hospital Metropolitano kept Sylvia at its facilities, despite the fact that it could not adequately treat Sylvia.

117. Hospital Metropolitano's medical, nursing and administrative personnel failed to release Sylvia or allow her to be transferred to another facility for the needed neurosurgical treatment, despite Sylvia's parents requests to allow them to do so.

118. Hospital Metropolitano negligently failed to timely and appropriately provide for the emergency, radiological, nursing, neurological, gastrointestinal and internal medicine treatment required by Sylvia P. Martinez Hodgson.

119. Hospital Metropolitano failed to ensure the proper medical and technical care of Sylvia P.

Martinez by its departments.

120. Hospital Metropolitano's medical and nursing personnel negligently failed to timely and appropriately treat and transfer Sylvia P. Martinez Hodgson to a facility with a neurosurgeon, a working MRI and competent nursing care and responsive consulting physicians.

121. Pavia Health System's executive director, Mr. Alfredo Volcker was personally appraised of the need to transfer Sylvia to another institution for urgent care and failed to act on it with the extreme urgency such request required.

122. At all times herein pertinent, co-Defendant Hospital Metropolitano, its directors, officers, and employees were negligent in failing to provide the proper medical attention to Sylvia P. Martinez Hodgson, in failing to provide the proper supervision of co-defendants and as well as the medical personnel Hospital Metropolitano employs, and otherwise failing to exercise due care and caution to prevent the tortious conduct and injuries to Plaintiffs and to Sylvia P. Martinez Hodgson.

123. Hospital Metropolitano, not only failed to adequately supervise the Defendant physicians, but also permitted the use of its facilities, allowing, encouraging, and condoning the negligent care and improper treatment of Sylvia P. Martinez Hodgson, proximately and directly causing Plaintiffs' injuries.

124. Hospital Metropolitano failed to staff its hospital with the medical personnel and equipment necessary to timely, appropriately, and safely treat its patients and ensure prompt emergency attention.

125. In so doing, Hospital Metropolitano misled those who sought full hospital treatment into thinking that they would be appropriately treated.

126. Hospital Metropolitano did not provide the timely services of persons capable of properly and effectively coordinating its departments.

127. As a direct and proximate result of Hospital Metropolitano's lack of supervision, direct action of its employees and failure to staff its departments with the medical personnel and personnel in charge of coordinating and communicating vital information necessary to appropriately treat emergency situations at Hospital Metropolitano, Hospital Metropolitano and its personnel negligently caused Plaintiffs the untimely death of their granddaughter/niece/cousin and the injuries as described herein.

128. As a direct and proximate cause of co-Defendant Hospital Metropolitano and its personnel's failure to properly treat Sylvia P. Martinez Hodgson, Plaintiffs sustained severe pain and suffering and other damages, as described below.

**SECOND CAUSE OF ACTION FOR NEGLIGENCE UNDER ARTICLES 1802 & 1803
AGAINST DR. JORGE RIVERA-VARGAS, DR. LARRY VAN DAALEN,
DR. MELÉNDEZ, DR.  LARRY BERNIER, DR. FRANCES VÉLEZ**

129. The allegations contained above are incorporated by reference as if again fully set forth herein.

130. Co-Defendants  Dr. RIVERA-VARGAS,  DR.  VAN DAALEN,  DR.  BERNIER,  DR. MELENDEZ RIOS and Dr. VELEZ' (hereinafter "codefendant physicians") intervention with Sylvia while she was at Co-Defendant Hospital Metropolitano was below the standard that satisfies the exigencies generally recognized by the medical profession in light of the modern means of communication and teaching and, as such, directly caused and/or contributed to causing the premature death of Sylvia and, thus, the pain and suffering of Plaintiffs, as described herein.

131. Co- Defendants, Dr. Bernier, Dr. Van Daalen, Dr. Rivera Vargas and Dr. Velez failed to exercise reasonable care and skill commensurate with the standard of care practiced in the medical profession at that time and under like and similar circumstances when they failed to take immediate measures to treat Sylvia's neurological emergency by placing, obtaining or providing immediate neurological and neurosurgical care or immediately transferring Sylvia to a suitable facility to provide such care.

132. Co-defendant physicians failed to transfer Sylvia to obtain lifesaving treatment for Sylvia at another hospital where neurosurgery was available.

133. Co-Defendant, Dr. Bernier failed to exercise reasonable care and skill commensurate with the standard of care practiced in the medical profession at that time and under like and similar circumstances when he failed to promptly treat, stabilize and transfer Sylvia to another institution which could handle her neurological emergency.  Instead, Dr. Bernier lost vital time without providing the proper care and contributed to her admission to an inadequate facility and ultimate demise.

134. Co-Defendant, Dr. Melendez failed to exercise reasonable care and skill commensurate with the standard of care practiced in the medical profession at that time and under like and similar circumstances when he failed to promptly evaluate, treat, stabilize and transfer Sylvia to another institution which could handle her condition.  Instead, Dr. Melendez showed up two days after being called, thereby losing vital time without providing the proper care and thereby contributed to her inadequate treatment and ultimate demise

135.  Co-Defendant physicians failed to exercise reasonable care and skill commensurate with the standard of care practiced in the medical profession at that time and under like and

similar circumstances when they failed to promptly and adequately treat and/or insure that Sylvia receive the treatment required by her life-threatening condition.

136.  As a direct and proximate cause of Co-Defendant physicians' actions and omissions upon being presented with a patient in Sylvia' condition, Sylvia was deprived of an opportunity to be promptly and adequately treated when time was of the essence and, consequently, the Plaintiffs, through the premature death of Sylvia, have been deprived of her joy of life, companionship and love.

137.  In so doing, Co-Defendant physicians committed professional negligence, including lack of expertise, fault and malpractice, which directly and proximately caused the death of Sylvia and damages to plaintiffs as detailed hereinafter.

**THIRD CAUSE OF ACTION**
**FOR NEGLIGENCE UNDER ARTICLES 1802 & 1803**
**OF THE PUERTO RICO CIVIL CODE AGAINST**
**CONTINENTAL INSURANCE COMPANY**

138.  The allegations contained above are incorporated by reference as if again fully set forth herein.

139.  Co-Defendant Continental Insurance Company was at all times herein pertinent an insurance company authorized to do business in the Commonwealth of Puerto Rico and which issued a public liability and/or malpractice insurance policy on behalf of Co-Defendant, Hospital Metropolitano.

140.  Pursuant to 26 P.R. Laws Ann. § 2001, an insurance company is liable for the negligence or fault of its insured.

141.  Pursuant to 26 P.R. Laws Ann. § 2003, an action against an insurer may be brought separately or may be joined together with an action against its insured.

142.  Therefore, Co-Defendant Continental Insurance Company is jointly and severally liable to all Plaintiffs for the damages caused to them by Co-Defendant Hospital Metropolitano.

**FOURTH CAUSE OF ACTION
FOR NEGLIGENCE UNDER ARTICLES 1802 & 1803
OF THE PUERTO RICO CIVIL CODE
AGAINST ABC INSURANCE CO.**

143.  The allegations contained above are incorporated by reference as if again fully set forth herein.

144.  Co-Defendant ABC Insurance Co. was at all times herein pertinent an insurance company authorized to do business in the Commonwealth of Puerto Rico and which issued a public liability and/or malpractice insurance policy on behalf of one or more Co-Defendants.

145.  Pursuant to 26 P.R. Laws Ann. § 2001, an insurance company is liable for the negligence or fault of its insured.

146.  Pursuant to 26 P.R. Laws Ann. § 2003, an action against an insurer may be brought separately or may be joined together with an action against its insured.

147.  Therefore, Co-Defendant ABC Insurance Company is jointly and severally liable to all Plaintiffs for the damages caused to them by one or more Co-Defendants.

**FIFTH CAUSE OF ACTION
FOR NEGLIGENCE UNDER ARTICLES 1802 & 1803
OF THE PUERTO RICO CIVIL CODE
AGAINST JOHN DOE AND JAMES ROE, UNKNOWN JOINT TORTFEASORS**

148.  The allegations contained above are incorporated by reference as if again fully set forth herein.

149.  Co-Defendants John Doe and James Roe are so designated for lack of knowledge at this point in the proceedings.

150. Co-Defendants John Doe and James Roe's intervention in the nursing, technical or medical care of Sylvia while at Co-Defendant Hospital Metropolitano was below the nursing, technical and medical standard that satisfies the exigencies generally recognized by the respective professions in light of the modern means of communication and teaching and, as such, directly caused and/or contributed to causing Sylvia's death and, thus, the pain and suffering of all Plaintiffs upon his premature death, as described herein.

151. Co-Defendants John Doe and James Roe negligently and carelessly, breaching the medical standard that satisfies the exigencies generally recognized by the medical profession in light of the modern means of communication and teaching, failed to perform a complete, thorough and adequate medical examination of Sylvia, commensurate with her reported symptoms, and, as such, directly caused and/or contributed to causing his premature death and the pain and suffering such death caused upon the Plaintiffs.

152. Co-Defendants John Doe and James Roe negligently and carelessly failed to exercise reasonable care and skill commensurate with the standard of care practiced in the medical profession at that time and under like and similar circumstances when they failed to correctly and promptly recognize the patient's symptoms related to a neurological condition and, thus, failed to provide a prompt, complete, thorough and adequate emergency medical evaluation.

153. Co-Defendants John Doe and James Roe negligently and carelessly failed to promptly examine, evaluate and treat Sylvia, delaying her thorough examination and the provision of essential treatment.

154. Co-Defendants John Doe and James Roe failed to exercise reasonable care and skill commensurate with the standard of care practiced in the medical profession at that time and

under like and similar circumstances when they failed to correctly and promptly recognize and treat the patient's symptoms related to her VP shunt and, thus, failed to provide adequate medical evaluation and treatment.

155.  Co-Defendants John Doe and James Roe failed to exercise reasonable care and skill commensurate with the standard of care practiced in the medical profession at that time and under like and similar circumstances when they failed to provide Sylvia with appropriate treatment, but instead allowed evaluations and treatments that delayed and worsened her condition and caused her and Plaintiffs further damages.

156.  Co-Defendants John Doe and James Roe negligently and carelessly failed to provide proper care of their patient, Sylvia, by failing to engage in her examination, evaluation of symptoms and emergency transfer on a timely basis.

157.  As a direct and proximate cause of Co-Defendants John Doe and James Roe's negligent actions and omissions upon being presented with a patient in Sylvia' condition and with her clinical signs, Sylvia was deprived of the opportunity to be promptly treated when time was of the essence and the Plaintiffs, through the premature death of Sylvia, were deprived of her companionship, vitality, joy of life and love.

158.  In so doing, Co-Defendants John Doe and James Roe committed professional negligence, including lack of expertise, fault and malpractice, which directly and proximately caused the death of Sylvia P. Martinez Hodgson's, as detailed herein.

159.  As a direct and proximate cause of Co-Defendants John Doe and James Roe' s negligence in failing to properly treat Sylvia, Plaintiffs sustained severe pain and suffering upon the loss of their loved one.

## SIXTH CAUSE OF ACTION AGAINST
## THE CONJUGAL PARTNERSHIPS

160.  The allegations contained above are incorporated by reference as if again fully set forth herein.

161.  The activities by which the individual defendant doctors caused Plaintiffs' damages were activities that benefited their respective conjugal partnerships, referred to herein as Doe-Roe Conjugal Partnerships I-X, as Plaintiff lacks information as to the actual names of the respective wives and/or husbands.

162.  As such, each conjugal partnership is jointly and severally liable to Plaintiff for the damages caused by the individual physician Defendants.

## SEVENTH CAUSE OF ACTION
## AGAINST SIMED

163.  The allegations contained above are incorporated herein by reference as if again fully set forth herein.

164.  Co-Defendant SIMED was at all times herein pertinent, an insurance company authorized to do business as such in the Commonwealth of Puerto Rico which issued a public liability and/or malpractice insurance policy on behalf of one or more of the Co-Defendants.

165.  Pursuant to 26 P.R. Laws Ann. § 2001, an insurance company is liable for the negligence or fault of its insured.

166.  Pursuant to 26 P.R. Laws Ann. § 2003, an action against an insurer may be brought separately or may be joined together with an action against its insured.

167.  Therefore, Co-Defendant SIMED is jointly and severally liable to Plaintiffs for the damages caused to them by any and/or all physician Co-Defendants.

## EIGHT CAUSE OF ACTION
## AGAINST EFG INSURANCE COMPANY

168. The allegations contained above are incorporated herein by reference as if again fully set forth herein.

169. Co-Defendant EFG Insurance Company was at all times herein pertinent an insurance company authorized to do business in the Commonwealth of Puerto Rico and which issued a public liability and/or malpractice insurance policy on behalf of one or more of the Co-Defendants or unknown joint tortfeasors.

170. Pursuant to 26 P.R. Laws Ann. § 2001, an insurance company is liable for the negligence or fault of its insured.

171. Pursuant to 26 P.R. Laws Ann. § 2003, an action against an insurer may be brought separately or may be joined together with an action against its insured.

172. Therefore, Co-Defendant EFG Insurance Company is joint and severally liable to all Plaintiffs for the damages caused to them by any and/or all Co-Defendants, joint tortfeasors.

## DAMAGES

173. The allegations contained above are incorporated herein by reference as if again fully set forth.

174. As a result of the professional negligence, lack of expertise, fault and malpractice of all Co-Defendants, Plaintiffs unnecessarily and prematurely lost their dearly loved Sylvia.

175. As a result of the professional negligence, lack of expertise, fault, and malpractice of all Co-Defendants, Plaintiffs lived through the extraordinary pain and suffering of having their precious Sylvia die an untimely death at a young age of 23.

176. In losing Sylvia, Plaintiffs lost a beloved granddaughter, nice and cousin, respectively.

177. Sylvia was a fun loving, cheerful, happy, vital and lovely person, who was very much loved by plaintiffs.

178. Plaintiffs have suffered dearly the loss of Sylvia, with whom they will not be able to share the special moments of their lives and those of their growing families, as well as suffering being deprived of the irreplaceable company that was Sylvia, who was an example to all.

179. Plaintiffs' quality of life has been severely and permanently eviscerated as a result of Sylvia's death.

180. Plaintiffs were very close to Sylvia and will never have her company, her cheerfulness, her vitality or love for the rest of their lives.

181. As a direct and proximate result of the negligence of all Defendants, Plaintiffs will continue to suffer the irreparable loss of Sylvia and their quality of life will continue to be severely affected for the rest of their lives.

182. The acts and omissions of the Defendants have caused Plaintiff MARCOS A. HODGSON GOMEZ intense emotional pain and suffering, frustration and a grave sense of injustice, which value is equal to a sum not less than **SEVEN HUNDRED FIFTY THOUSAND DOLLARS ($750,000.00).**

183. The acts and omissions of the Defendants have caused Plaintiffs HENRY J. HODGSON-MICO, IRIS ROSA, BEVERLY HODGSON-ROSA, MARK A. HODGSON-MICO, YOLANDA GONZÁLEZ, AMANDA HODGSON-GONZÁLEZ, MICHAEL A. HODGSON-MICO, MICHELLE ACOSTA, M.H.A., S.H.A., DAMARIS E. MARTINEZ-PÉREZ, OSMANI CRUZ-MARTÍNEZ, HECTOR D. MARTÍNEZ- PÉREZ, JOSEFINA ECHAVARRÍA intense emotional pain and suffering, frustration and a grave sense of injustice equal to a sum not less than **TWO HUNDRED FIFTY THOUSAND**

**DOLLARS EACH ($250,000.00) FOR A TOTAL OF NO LESS THAN $3.5 MILLION DOLLARS.**

184.  The acts and omissions of the Defendants have caused Plaintiffs a loss which total value is no less than $4.25 MILLION DOLLARS.

<strong>TRIAL BY JURY DEMANDED</strong>

185.  Plaintiffs demand trial by jury on all causes of action herein raised.

**WHEREFORE,** Plaintiffs demand that judgment against the **DEFENDANTS** be entered, finding them to be jointly and severally liable to the **PLAINTIFFS** for an amount of no less than **$4.25 MILLION DOLLARS**, as well as costs and attorneys' fees and such other relief as this Honorable Court may esteem to be just and proper under the circumstances.

**RESPECTFULLY** submitted on this 16th day of September, 2014.

s/ *Jeffrey M. Williams*
Jeffrey M. Williams
USDCPR Bar No. 202414

s/ *Leticia Casalduc-Rabell*
Leticia Casalduc-Rabell
USDCPR Bar No. 213513

**INDIANO & WILLIAMS, P.S.C.**
*Attorneys for Plaintiffs*
207 Del Parque St., Third Floor
San Juan, Puerto Rico 00912
Tel: (787) 641-4545
Fax: (787) 641-4544
*jeffrey.williams@indianowilliams.com*
*leticia.casalduc@indianowilliams.com*